UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

                    Plaintiff,


          -against-                                                16-cv-4291 (LAK)


NEW YORK CITY DEPARTMENT OF EDUCATION,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
LISA-ERIKA JAMES,

                    Plaintiff,


          -against-                                                16-cv-4844 (LAK)


NEW YORK CITY DEPARTMENT OF EDUCATION et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ANTHONY RICCARDO,

                    Plaintiff,


          -against-                                                16-cv-4891 (LAK)


NEW YORK CITY DEPARTMENT OF EDUCATION et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/8/2020

**ORDER**

The defendants in these actions previously moved for summary judgment. In so doing, they submitted a statement under Rule 56.1 of the Local Civil Rules of this Court containing 341 paragraphs of proposed material facts that they asserted were not genuinely in dispute [16-cv-4891, DI-72]. The plaintiffs filed a joint response to the defendants' statement in which they agreed that a substantial number of these facts were not in dispute, either by asserting that they were undisputed or by failing to dispute them in substance [16-cv-4891, DI-79].

In view of the parties' inability to reach any meaningful stipulation of facts to shorten the trial and render the facts more readily understandable to the jury, the Court has prepared the attached draft of a statement of undisputed acts (the "Draft Statement") from the parties' Rule 56.1 statements. Subject to the following provisions of this order and the proceedings contemplated hereby, the Court intends to enter a further order, pursuant to Fed. R. Civ. P. 56(g), determining that the propositions contained in the Draft Statement (or any amendment thereof in light of subsequent comments by the parties) that in fact was undisputed at the time of plaintiffs' response to defendants' Rule 56.1 statement are not genuinely in dispute and are binding on the jury although they are to be considered in the context of all of the evidence. The following additional points are appropriate:

1.    The point of making a Rule 56(g) determination is to eliminate needless proof of facts that are not genuinely in dispute and thereby to try the case more efficiently. In principle, a Rule 56(g) determination could foreclose the presentation of additional evidence on an undisputed fact. The Court does not expect to carry that principle to its logical extreme. It anticipates that some witnesses may have occasion to mention undisputed facts that are subjects of the Rule 56(g) determination in order to maintain continuity of narrative or for other sensible purposes. But it does expect, depending upon the circumstances, to foreclose needless repetition and cumulative proof.

2.    The Court has considered the parties' contentions that additional evidence may place particular undisputed facts in a different light. But that is not a sufficient excuse for refusing to stipulate to so much as is undisputed. Nor is it a sufficient reason not to enter a Rule 56(g) order.

3.    In order to conform to the text of the parties' Rule 56.1 statements, the Draft Statement contains some factual propositions stated in the present tense notwithstanding that the parties' agreement that the factual propositions were undisputed occurred some time ago and spoke only with respect to the period up to the date of the parties' agreement, *i.e.*, the date of plaintiffs' response to defendants' Rule 56.1 statement and not beyond. It therefore is possible that some such propositions are not accurate with respect to subsequent dates.

This possibility might be dealt with by redrafting each of those present tense propositions to make clear the time period as to which each has been agreed to be accurate. The Draft Statement has not taken that approach in order to conform the text as closely as possible to the parties' Rule 56.1 Statements. Rather, the Court anticipates instructing the jury that factual propositions contained in the Final Statement that speak in the present tense were true at all times relevant to these cases but that any question or concern as to whether they remain true as of the time

of trial is immaterial and should not be considered by the jury. But the Court solicits the parties' views as to the best method of handling this concern.

4. The Court understands that there may be objections to the admissibility of particular propositions, *e.g.*, on grounds of relevancy, hearsay, etc. Except as set forth below, nothing in this order or in the Draft Statement forecloses any such objections.

In light of the foregoing, the parties on or before January 16, 2020 shall file written statements containing all of their comments responsive to paragraph 3 and all of their objections to admissibility of particular propositions in the Draft Statement. Any objections to admissibility not included therein shall be deemed forfeited.

If any comments or objections are timely filed, the Court will hear argument on January 23, 2020 at 10 a.m.

SO ORDERED.

Dated:        January 8, 2020

_____
Lewis A. Kaplan
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DRAFT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

        Plaintiff,

    -against-

                        16-cv-4291 (LAK)

NEW YORK CITY DEPARTMENT OF EDUCATION,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LISA-ERIKA JAMES,

        Plaintiffs,

    -against-

                        16-cv-4844 (LAK)

NEW YORK CITY DEPARTMENT OF EDUCATION et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANTHONY RICCARDO,

        Plaintiffs,

    -against-

                        16-cv-4891 (LAK)

NEW YORK CITY DEPARTMENT OF EDUCATION et al.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**UNDISPUTED FACTS**

LEWIS A. KAPLAN, *District Judge*.

Prior proceedings have established that the facts set forth below are undisputed. The jury is obliged to accept them as true for purposes of this action.

Certain of the facts stated below are couched in the present tense. For example, paragraph 20 states that "Formal and informal observations are rated either Unsatisfactory or Satisfactory." In considering facts so stated, it has been determined that those facts were true at all times relevant to these actions up to and including late 2013. Any question or concern as to whether any such fact remained true after that date or remains true now is immaterial and should not be considered by the jury.

## I.    Pan American International High School at Elmhurst

1.    Pan American International High School at Elmhurst ("Pan American"), a New York City Department of Education ("DOE") high school is part of the International Network, which is a network of fourteen schools with a specific English as a Second Language ("ESL") model. Ninety-nine percent of the student population are native Spanish speakers. Pan American was also part of the Children's First Network ("CFN") 106. Plaintiffs' Response and Counter-Statement of Material Facts Under Local Civil Rule 56.1(b) (hereinafter "Rule 56.1 Response") ¶ 1. *See also* Exs. I at 35, 77; P at 18; D at 81; L at 23; S-V.

2.    CFN 106 was a support group for 25 schools, including Pan American. Rule 56.1 Response ¶ 2. *See also* Exs. D at 36; L at 15.

3.    During the 2010-11 and 2011-12 academic years, the principal Pan American of was Marcella Barros. Rule 56.1 Response ¶ 5.

4.      After Ms. Barros left Pan American, Minerva Zanca was appointed as acting principal of Pan American.  She held that position from August 2012 to June 2015.  Rule 56.1 Response ¶ 6.  *See also* Exs. D at 46-47; G at 20; T at USA 000282; U at USA 000304.

## II.      Pan American's Administrators

### (a) Defendant Minerva Zanca ("Principal Zanca")

5.      Defendant Minerva Zanca was appointed as principal of Pan American, in an interim acting basis, at the start of the 2012-13 school year.  Rule 56.1 Response ¶ 11.  *See also* Exs A at 62; F at 36-37; I at 60-65; W.

6.      On April 4, 2013, following a C-30 process, Ms. Zanca was appointed as principal of Pan American.  Rule 56.1 Response ¶ 12.  *See also* Exs. I at 60-65, 90-93; W; X.

7.      Prior to becoming principal of Pan American, Principal Zanca had served as an assistant principal ("AP") for two years, a guidance counselor and teacher for a combined total of ten years, and a Spanish language teacher for twelve years for approximately 24 years of DOE service prior to becoming Principal.  Rule 56.1 Response ¶ 13.  *See also* Ex. F at 11.

8.      Ms. Zanca was the principal for Pan American for the academic years 2012-13, 2013-14 and 2014-15.  She served as acting principal until April 2013.  Rule 56.1 Response ¶ 16.  *See also* Exs. E at 46-47; G at 20.

### (b) Defendant Juan Mendez ("Superintendent Mendez")

9.      Superintendent Mendez began working for the DOE in August 1985.  Rule 56.1 Response ¶ 18.  *See also* Exs. H at 6-8: I at 19.

10.    Since 2015, Superintendent Mendez has served as the superintendent of schools for the New Visions Schools in Queens and Bronx counties, and District 28, of the DOE. Rule 56.1 Response ¶ 19. *See also* Exs. H at 5; I at 19-20.

11.    Between 2011 and 2014, Superintendent Mendez was the Queens High School Superintendent, during which time he oversaw 89 high and secondary schools in Queens County. Rule 56.1 Response ¶ 20. *See also* Ex. I at 20-21.

12.    As Queens High School superintendent, Superintendent Mendez directly supervised the principals of the 89 schools under his purview and functioned as their rating officer. He also attended district leadership and community meetings. He conducted quality reviews, which are qualitative evaluations of the schools he supervised. Rule 56.1 Response ¶ 21. *See also* Ex. I at 21-22.

13.    As part of his responsibilities as superintendent, Superintendent Mendez determined teachers' tenure, probation extensions, and discontinuances. Rule 56.1 Response ¶ 22. *See also* Ex. I at 22-23.

14.    In his role as superintendent, Superintendent Mendez did not conduct investigations into employee complaints of discrimination, but he authorized the discipline of employees as a result of findings by the DOE's Office of Equal Opportunity ("OEO"). Rule 56.1 Response ¶ 23. *See also* Ex. I at 26-31.

### III. The 2012-2013 Teacher Rating Process

15.    From 2010 to 2013, one evaluation system existed for rating teachers, whether those teachers had received tenure, or had not yet completed their probationary period. The evaluation procedure is set forth in Article 8 of the collective bargaining agreement for

teachers, which specifically references "Teaching in the 21st Century" and also can be found in the Rating Pedagogical Staff Members manual. Rule 56.1 Response ¶ 26. *See also* Exs. J at 21-22; Y.

16. During the 2010-13 academic years, probationary teachers were subject to a three-year probationary period. The three year probationary period could be extended at the end of the third year based on the recommendation of the principal, who functioned as the teacher's rating officer. The superintendent then reviewed the recommendation and issued the final decision. Extensions of probation are generally for one-year periods. Rule 56.1 Response ¶ 27. *See also* E at 44; E at 44; J at 40-42; Y at USA 3039.

17. There is no limitation on how many extensions of probation can be granted. Rule 56.1 Response ¶ 28. *See also* Ex. J at 42.

18. Formal observations could be conducted by principals, assistant principals, or a combination of these administrators. Rule 56.1 Response ¶ 32. *See also* Ex. J at 50.

19. Formal observations are preceded and followed by a conference with the evaluating administrator(s). The pre-observation conference is for the purpose of discussing the lesson plan and answering any question the teacher may have. The post observation conference is held in order to provide the teacher with feedback about the observed lesson, answer any questions, and provide strategy for future lessons. The observation report must be memorialized within three months of the observation. Rule 56.1 Response ¶ 34. *See also* Exs. G at 45-46; at 25; J at 48, 50-52; Z.

20. Formal and informal observations are rated either Unsatisfactory or Satisfactory. Rule 56.1 Response ¶ 36. *See also* Exs. G at 47; J at 54; Y at USA003032.

21. The purpose of the observations is to allow the rating officer to determine the teacher's strengths and weaknesses. They are also used as a tool to observe how a teacher responds to feedback. Rule 56.1 Response ¶ 37. *See also* Exs. E at 31-32; I at 100-102.

22. Logs of support are a record of support provided to the teacher including professional development, team meeting, feedback from mini, informal and formal observations, and any outside professional development received. Logs of support are implemented when there are signs that a teacher is struggling, resistant to guidance and/or unwilling to improve. Rule 56.1 Response ¶ 38. *See also* Exs. E at 155; G at 58-59.

23. At the end of the academic year, all teachers receive an annual rating. During the 2012-2013 academic year, teachers could receive either a Satisfactory or Unsatisfactory rating.

24. Annual ratings are based on the teacher's observation ratings, disciplinary letters, logs of support, goals, and/or attendance. The DOE does not require a principal to weigh any one component more than another one. Further, the DOE does not set any specific number of unsatisfactory observations that will lead to an unsatisfactory annual performance rating. Rule 56.1 Response ¶ 40. *See also* Exs. G at 33, 56-57; I at 211-212; J at 54-56; Y at USA 003032.

25. An unsatisfactory annual performance rating can lead to a teacher's discontinuance. Upon discontinuance, a teacher's license could be revoked which would not allow the teacher to teach anywhere in the DOE. A teacher could also be discontinued without a revocation of license, which would allow the teacher to work in a different district from which teacher had been discontinued. Rule 56.1 Response ¶ 41. *See also* Ex. J at 57, 64-65; Y at USA 003036.

26. Annual ratings of teachers are prepared by the principal: a superintendent does not rate the teacher. The superintendent, however, makes the decision whether to grant a teacher tenure. Rule 56.1 Response ¶ 42. *See also* Ex. J at 70-73.

27. If the superintendent decides to discontinue a teacher, a letter is sent to the teacher with 30 days' notice. The teacher then has an opportunity to provide information to dispute the discontinuance. Rule 56.1 Response ¶ 43. *See also* Exs. J at 74, 75; M at 83-84.

28. Any teacher can grieve, or appeal, an unsatisfactory annual performance rating or discontinuance. Rule 56.1 Response ¶ 44. *See also* Ex. J at 211.

29. Superintendents and principals have some discretion to change an employee's annual performance rating. The annual performance rating can also be changed as a result of an appeal. Rule 56.1 Response ¶ 45. *See also* Ex. J at 36, 39.

30. Assistant principals also are subject to an evaluation process and annual reviews. At the beginning of the year, the assistant principal establishes goals and objectives with his or her supervisor, which are subsequently memorialized on a form. Then at the end of the year, there is an evaluation of the year-long performance of the assistant principal measured against the goals and objectives. Rule 56.1 Response ¶ 46. *See also* Ex. J. at 107-108.

31. Assistant principals also are subject to a probationary period, which is five years long. Like teachers, the probationary period for an assistant principal can be similarly extended. Rule 56.1 Response ¶ 47. *See also* Ex. J. at 109.

32. Also similar to teachers, during the 2012-2013 academic year, assistant principals received annual ratings of either Satisfactory or Unsatisfactory. Rule 56.1 Response ¶ 48. *See also* Ex. J at 109-110.

33.     As with teachers, the principal makes the recommendation as to whether an assistant principal receives tenure, an extension of probation, or discontinuance. The final determination with respect to an assistant principal's employment status is made by the superintendent.  Rule 56.1 Response ¶ 49.  *See also* Ex. J at 111-112.

34.     Principals may also have their licenses terminated.  Rule 56.1 Response ¶ 50. *See also* Ex. J at 111-112.

35.     All pedagogical employees, including teachers and assistant principals, on probation can appeal the decision to terminate the employee's license to the DOE's Office of Appeals and Reviews.  Rule 56.1 Response ¶ 51.  *See also* Ex. AA.

## IV.     John Flanagan ("Mr. Flanagan")

36.     Mr. Flanagan commenced his employment as a teacher with the DOE in 2008.  Rule 56.1 Response ¶ 52.  *See also* Ex. A. at 12.

37.     Mr. Flanagan was subject to a three year probationary period.  This period of probation was extended twice so that his probationary period was scheduled to end in the fall of 2013, which was his fifth year of probationary service.  Rule 56.1 Response ¶ 53.  *See also* Ex. A at 41-44, 54:11-21, 60-62.

38.     Mr. Flanagan was assigned to Pan American to teach native language arts, Spanish.  Rule 56.1 Response ¶ 54.  *See also* Ex. A 13, 15:3-20.

39.     At the end of the 2011-12 academic year, Mr. Flanagan was rated "satisfactory" on his year-end evaluation by Principal Barros.  Rule 56.1 Response ¶ 55.

40.     Superintendent Mendez extended Mr. Flanagan's probation at the end of the 2011-2012 school year.  Rule 56.1 Response ¶ 56.

41.     At the start of the 2012-13 school year, Principal Zanca became the principal of Pan American. Rule 56.1 Response ¶ 57. *See also* Ex. F at 72-74.

42.     Principal Zanca conducted informal classroom visits of Mr. Flanagan on September 7, 12, and 27, 2012. Rule 56.1 Response ¶ 58. *See also* Ex. BB.

43.     On November 8, 2012, Principal Zanca and Assistant Principal Riccardo conducted a joint formal observation of Mr. Flanagan for which he received an unsatisfactory rating. Rule 56.1 Response ¶ 59. *See also* Ex. CC.

44.     On November 19, 2012, Principal Zanca and Assistant Principal Riccardo conducted a joint informal observation of Mr. Flanagan. This observation was also rated unsatisfactory. Rule 56.1 Response ¶ 60. *See also* Ex. DD.

45.     Mr. Flanagan signed the November 19, 2012, Observation Report on November 28, 2012, which specifically informed him that "[u]nsatisfactory observations may lead to an unsatisfactory rating and charges that may lead to your termination." Rule 56.1 Response ¶ 61. *See also* Ex. DD.

46.     On December 17, 2012, Principal Zanca and Assistant Principal Riccardo conducted a joint formal observation of Mr. Flanagan, for which he received a "satisfactory" rating. Rule 56.1 Response ¶ 62. *See also* Ex. EE.

47.     On January 7, 2013, Principal Zanca and Assistant Principal Riccardo conducted a joint informal observation of Mr. Flanagan for which he received an unsatisfactory rating. In the observation it was specifically noted that Mr. Flanagan's failure to provide a hard copy of the corresponding lesson plan could "result in an automatic rating of unsatisfactory for the lesson." Rule 56.1 Response ¶ 63. *See also* Ex. G at 318; FF.

48.     Mr. Flanagan signed the January 7, 2013, Observation Report on March 21, 2013. Rule 56.1 Response ¶ 64. *See also* Ex FF at 3.

49.     On February 14, 2013, Principal Zanca and Assistant Principal Riccardo conducted another joint informal observation of Mr. Flanagan, which was followed by a post-observation conference and for which Mr. Flanagan received another unsatisfactory rating. Rule 56.1 Response ¶ 65. *See also* Ex. GG.

50.     On May 8, 2013, Principal Zanca and Eduardo Medrano, an Assistant Principal of Newtown High School ("Assistant Principal Medrano"), conducted a joint formal observation of Mr. Flanagan. Rule 56.1 Response ¶ 66. *See also* G at 110-112; HH.

51.     Assistant Principal Medrano had been selected to conduct the observation of Mr. Flanagan with Principal Zanca because he was an experienced educator with the same subject area expertise as Mr. Flanagan. Rule 56.1 Response ¶ 68. *See also* Exs. F at 117, 121-122; H at 86- 87, 91; G at 110-112; I at 125-126, 129; K at 39.

52.     Assistant Principal Medrano also had some familiarity with Pan American. In Assistant Principal Riccardo's absence, he supervised the Saturday and after-school programs at Pan American and taught ESL to Pan American's parents. Rule 56.1 Response ¶ 69. *See also* Ex. K at 28-29.

53.     Mr. Flanagan was issued an unsatisfactory rating for this lesson. Rule 56.1 Response ¶ 70. *See also* Ex. HH.

54.     In the May 8, 2013, Observation Report, Principal Zanca noted that the lesson was teacher-centered and that both the lesson and the homework packets lacked academic rigor. Rule 56.1 Response ¶ 71. *See also* Ex. HH.

55.     The defendants contend that on May 21, 2013, Mr. Flanagan was involved in an incident with a student. Rule 56.1 Response ¶ 74.

56.     Principal Zanca stated in a June 5, 2013 Letter to File that she conducted an investigation of the incident, interviewing Mr. Flanagan and obtaining statements from the student-complainant and witnesses. Rule 56.1 Response ¶ 75. *See also* Ex. JJ.

57.     In the Letter to File, Principal Zanca stated also that following her investigation, she concluded that Mr. Flanagan had had an argument with the student-complainant and during the argument he used an expletive in front of the students. She further concluded that his behavior demonstrated "poor judgment." Rule 56.1 Response ¶ 76. *See also* Ex. JJ.

58.     Principal Zanca offered Mr. Flanagan professional development in de-escalating strategies with students and warned that his actions could lead to an unsatisfactory rating or termination. Rule 56.1 Response ¶ 77. *See also* Ex. JJ.

59.     For the 2012-13 school year, Mr. Flanagan received an unsatisfactory rating from Principal Zanca on his end-of-year Annual Professional Performance Review ("APPR") and Principal Zanca recommended the discontinuance of his employment at Pan American. She stated that she made this recommendation because he struggled teaching Spanish to native Spanish speakers. Rule 56.1 Response ¶ 78. *See also* Exs. G at 102-103; H at 29-30, KK.

60.     In giving Mr. Flanagan an end-of-year unsatisfactory rating, Principal Zanca referred to his unsatisfactory observation reports for November 8, and 19, 2012, January 7, February 14, and May 8, 2013, as well as the June 5, 2013 Letter to File. Rule 56.1 Response ¶ 79. *See also* Ex. KK at 2-3.

61.     In making his determination as to whether to discontinue Mr. Flanagan, Superintendent Mendez stated that he reviewed his rating sheet evaluation for the 2012-13 school

year and the documentation from Pan American in support of the recommendation of discontinuance. Rule 56.1 Response ¶ 81. *See also* Ex. H at 29-30.

62.     By letter from Superintendent Mendez to Mr. Flanagan, dated June 14, 2013, Mr. Flanagan was informed that the Superintendent was reviewing and considering whether Mr. Flanagan's services as a probationary teacher would be discontinued as of the close of business, July 17, 2013. Rule 56.1 Response ¶ 82. *See also* Ex. H at 35-36.

63.     Superintendent Mendez afforded Mr. Flanagan until July 17, 2013, to submit a written response regarding the consideration of the discontinuance of Mr. Flanagan's probationary employment. Rule 56.1 Response ¶ 83. *See also* Ex. H at 36-37.

64.     Superintendent Mendez informed Mr. Flanagan of his decision in a letter, dated August 8, 2013. Rule 56.1 Response ¶ 87.

65.     Superintendent Mendez stated that he did not receive Mr. Flanagan's written response until later in August 2013, after Superintendent Mendez had already issued the letter discontinuing Mr. Flanagan's probationary employment. But upon receipt, Superintendent Mendez reviewed and considered Mr. Flanagan's written response. It did not alter his decision. Rule 56.1 Response ¶ 88. *See also* Exs. H at 49-50, 99-100, I at 247-257.

66.     Assistant Principal Riccardo observed that Mr. Flanagan "struggled with classroom management." Rule 56.1 Response ¶ 91. *See also* Ex. D at 11-12.

67.     Mr. Flanagan first complained to Principal Zanca of unfair treatment in January or February of 2013, but never used the word "discrimination." Rule 56.1 Response ¶ 107. *See also* Ex. A at 212- 213.

68.     Mr. Flanagan then filed a complaint of discrimination with the DOE's Office of Equal Opportunity ("OEO") on June 3, 2013. Rule 56.1 Response ¶ 108.

69.     Mr. Flanagan spoke to the press after he was discontinued.  Rule 56.1 Response ¶ 110.  *See also* Ex. A at 240.

70.     Mr. Flanagan believes that Superintendent Mendez's official determination discontinuing him from probationary employment at Pan American was in retaliation for Mr. Flanagan speaking to the press.  Rule 56.1 Response ¶ 111.  *See also* Ex. A at 241.

71.     Mr. Flanagan alleged that he was accused of stealing Pan American property in retaliation for going to the press.  Rule 56.1 Response ¶ 112.  *See also* Ex. A. at 242-244.

## V.     Heather Hightower ("Ms. Hightower")

72.     Ms. Hightower began working for the DOE in 2009 as a paraprofessional. Rule 56.1 Response ¶ 115.  *See also* Ex. B at 12-13.

73.     While working at DOE, Ms. Hightower was a member of the union United Federation of Teachers.  Rule 56.1 Response ¶ 116.  *See also* Ex. B at 73.

74.     At the start of the 2010-11 academic year, Ms. Hightower began working at Pan American as a 9th and 10th grade science teacher with an ESL teaching license for grades K-12 from New York State.  Rule 56.1 Response ¶ 117.  *See also* Ex. B at 19-21.

75.     Ms. Hightower did not have any other teaching licenses.  Rule 56.1 Response ¶ 118.  *See also* Ex. B at 20.

76.     When Ms. Hightower began working at Pan American she was a probationary teacher.  She did not become eligible for tenure until the end of the 2012-13 academic year.  Rule 56.1 Response ¶ 119.  *See also* Ex. B at 21, 32.

77.     Ms. Hightower continued to work at Pan American as a Science teacher during the 2011-12 academic year.  Rule 56.1 Response ¶ 120.  *See also* Ex. B at 33.

78. During that school year, she received both informal and formal observations from the Principal Barros and Assistant Principal Riccardo. Rule 56.1 Response ¶ 121. *See also* Ex. B at 34, 36-37.

79. Ms. Hightower continued to work at Pan American during the 2012-13 academic year, when Minerva Zanca became the principal of Pan American. Rule 56.1 Response ¶ 122. *See also* Ex. B at 64, 66.

80. During the 2012-13 academic year, Principal Zanca and Assistant Principal Riccardo observed Ms. Hightower informally and formally. Ms. Hightower recalled that at the beginning of the academic year, Principal Zanca had informed all the teachers that she would be conducting observations throughout the school year. Rule 56.1 Response ¶ 123. *See also* Ex. B at 104.

81. For her formal observations, Ms. Hightower would have pre- and post-observation conferences with Principal Zanca and/or Assistant Principal Riccardo and would receive a written report regarding the observation. Rule 56.1 Response ¶ 125. *See also* Exs. B at 37, 71-72, 94; RR-TT; VV-XX.

82. Principal Zanca had Ms. Hightower meet with Assistant Principal Riccardo every two weeks to review her curriculum planning, content planning, and content area. Ms. Hightower admitted that she found these meetings helpful. Rule 56.1 Response ¶ 129. *See also* Ex. B at 126-127.

83. Ms. Hightower never complained about having to meet with a content area coach during the 2012-13 academic year. Rule 56.1 Response ¶ 130. *See also* Ex. B at 97-99.

84. On September 14, 2012, Ms. Hightower was informally observed by Principal Zanca and Assistant Principal Riccardo. During this observation, she did not have her

lesson plan. Rule 56.1 Response ¶ 131. *See also* Exs. E at 110-112, 114-115; PP; RR at USA002422.

85.     On November 28, 2012, Ms. Hightower received an unsatisfactory formal observation from Principal Zanca and Assistant Principal Riccardo. Ms. Hightower did not believe the observation to be discriminatory at the time, nor did she then complain about it. Rule 56.1 Response ¶ 132. *See also* Exs. B at 122-129; SS.

86.     In the November observation, it was noted that Ms. Hightower 1) asked questions that were of low cognitive challenge; 2) lacked differentiation in her curriculum; 3) failed to display current student work; 4) assigned tasks that focused on memorization as opposed to cognitive understanding; 5) created a lesson without synthesis; and 6) failed to ensure that the students comprehended the connection between the current lesson and prior ones. Rule 56.1 Response ¶ 133. *See also* Ex. SS.

87.     It was recommended that Ms. Hightower 1) reframe her "Aim" question to encourage active learning; 2) assign tasks of varying degrees of rigor; 3) display current student work to provide positive validation to the students; 4) begin to meet with Assistant Principal Riccardo every two weeks to go over lesson plans; 5) better organize her lesson plans; and 6) encourage discussion among her students to allow Ms. Hightower to better gauge the students' understanding of the current lesson vis-à-vis past lessons. Rule 56.1 Response ¶ 134. *See also* Ex. SS.

88.     On December 20, 2012, Ms. Hightower received an unsatisfactory formal observation from Principal Zanca and Assistant Principal Riccardo. Ms. Hightower acknowledges that at the time she was provided with the observation report, she did not believe the observation

to be discriminatory. Ms. Hightower now believes the observation to be discriminatory. Rule 56.1 Response ¶ 135. *See also* Exs. B, TT.

89. During the observation, Assistant Principal Riccardo specifically noted that Ms. Hightower did not have a lesson plan, did not have homework packets, did not have student work on the walls, and did not have an appendix. Rule 56.1 Response ¶ 136. *See also* Exs. E at 116-127; PP at USA 002859.

90. In the December observation report, it was noted that Ms. Hightower: 1) lacked questioning techniques that elicited the students' understanding of the materials; 2) lacked sufficient differentiation in her curriculum; 3) failed to post student work; and 4) failed to ensure that the students comprehended the connection between the current and prior lessons. Rule 56.1 Response ¶ 137. *See also* Ex. TT.

91. It was recommended that Ms. Hightower 1) ask more pointed questions of the students to ensure comprehension; 2) have tasks of different rigor to ensure appropriate differentiation in the curriculum; 3) post student work in order to validate their efforts; and 4) continue to meet with Assistant Principal Riccardo on a biweekly basis. Rule 56.1 Response ¶ 138. *See also* Ex. TT.

92. In January 2013, Ms. Hightower received an unsatisfactory formal observation from Principal Zanca and Assistant Principal Riccardo. Rule 56.1 Response ¶ 142. *See also* Exs. B at 140-145; WW.

93. In the January 2013 formal observation, it was noted that Ms. Hightower 1) lacked differentiation in her curriculum; 2) was not ensuring that the students comprehended the connection between current and prior lessons and 3) did not sufficiently proofread her materials. Rule 56.1 Response ¶ 143. *See also* Ex. WW.

94.     To aid Ms. Hightower, it was recommended that she continue to visit other science classes to observe their differentiation and teaching skills; continue to attend professional development courses and continue to meet with Assistant Principal Riccardo on a bi-weekly basis. Rule 56.1 Response ¶ 144. *See also* Ex. WW.

95.     Ms. Hightower did not complain about the rating and she also did not inquire if she could grieve or appeal the rating. Rule 56.1 Response ¶ 145. *See also* Ex. B at 144-145.

96.     In April 2013, Assistant Principal Riccardo conducted Ms. Hightower's fourth formal observation. The observation report was not completed until June 6, 2013 and it was rated Satisfactory. Ms. Hightower did not complain about the observation nor did she find it be discriminatory. Rule 56.1 Response ¶ 146. *See also* Ex. B at 147-50; XX.

97.     In June 2013, Principal Zanca conducted another informal observation of Ms. Hightower's class and gave her an unsatisfactory rating. Rule 56.1 Response ¶ 149. *See also* Exs. G at 87-88; WW.

98.     Ms. Hightower received an Unsatisfactory annual performance rating on June 13, 2013. Principal Zanca also recommended that her probationary service be discontinued. Rule 56.1 Response ¶ 154. *See also* Exs. B at 157-160; YY.

99.     Superintendent Mendez initially agreed with Principal Zanca's recommendation, but as per his policy, he provided Ms. Hightower with an opportunity to submit a written rebuttal of the stated reasons for her discontinuance. Rule 56.1 Response ¶ 156. *See also* Exs. YY, ZZ.

100.     In May or June 2013, Ms. Hightower received Assistant Principal Riccardo's written statement wherein he alleged that Principal Zanca had made discriminatory comments

about Ms. Hightower, Mr. Flanagan, and Ms. James during the fall of the 2012-13 academic year. Rule 56.1 Response ¶ 162. *See also* Exs. B at 167-169; IIII.

101.   It was only after she received Assistant Principal Riccardo's June 24, 2013 written statement that Ms. Hightower learn about the discriminatory comments Principal Zanca allegedly said about her. Rule 56.1 Response ¶ 163. *See also* Ex. B at 168-169.

102.   Ms. Hightower never heard Principal Zanca make any discriminatory comments and had not been informed by Assistant Principal Riccardo about the alleged comments during the 2012-13 academic year. Rule 56.1 Response ¶ 164. *See also* Ex. B at 169-172, 188.

## VI.     Plaintiff Lisa-Erika James ("Ms. James")

103.   Ms. James began working for the DOE in 2003, and she began teaching at Pan American in 2011 at its theater teacher. She continues to be employed by the DOE. Rule 56.1 Response ¶ 167. *See also* Exs. C at 16-17, 67; CCC.

104.   Ms. James is a tenured teacher. Rule 56.1 Response ¶ 168. *See also* Ex. DDD.

105.   On November 8, 2012, Principal Zanca and Assistant Principal Riccardo observed Ms. James's theater class. The observation report noted that the lesson included "several commendable aspects," that the lesson "flowed extremely well," and that the lesson included "many opportunities" to assess students' "use and acquisition of English." Rule 56.1 Response ¶ 170. *See also* Ex. FFF.

106.   For improvement, the observation report suggested that Ms. James "be cognizant of the quieter" students who are "less apt to put themselves out in front of the class."

The report concluded with recognition for Ms. James's contribution to the school. Rule 56.1 Response ¶ 171. *See also* Ex. FFF.

107. The lesson received a rating of satisfactory. Rule 56.1 Response ¶ 172. *See also* Ex. FFF.

108. By letter dated December 17, 2012, Principal Zanca thanked Ms. James for speaking at an event attended by community leaders and DOE officials. Principal Zanca specifically noted how fortunate Pan American was to have Ms. James's services. Rule 56.1 Response ¶ 173. *See also* Ex. GGG.

109. On April 15, 2013, Assistant Principal Riccardo observed Ms. James's teaching and rated the lesson as Satisfactory. Rule 56.1 Response ¶ 174. *See also* Ex. HHH.

110. By letter dated May 22, 2013, Principal Zanca thanked Ms. James for volunteering to administer a state examination to more than 300 students, which Principal Zanca acknowledged was not an easy task. Rule 56.1 Response ¶ 175. *See also* Ex. III.

111. The letter commended Ms. James's commitment to student learning and lauded how those traits made her a valuable colleague and teacher. Rule 56.1 Response ¶ 176. *See also* Ex. III.

112. On June 13, 2013, Principal Zanca gave Ms. James an annual performance rating of Satisfactory. Rule 56.1 Response ¶ 177. *See also* JJJ.

113. Ms. James stated that when Principal Zanca started at Pan American in September 2012, Principal Zanca was abrasive and dismissive toward her. Rule 56.1 Response ¶ 178. *See also* Ex. C at 23-24.

114. Ms. James believed Principal Zanca to be unenthusiastic and uninterested in hearing about Pan American's theater program and its history. She testified that in the fall of

2012 when she approached Principal Zanca in the hallway to discuss the theater program, Principal Zanca said, "'Okay, okay, okay'" and threw her hands in the air." Rule 56.1 Response ¶ 180. *See also* Ex. C at 32-35.

115.    Ms. James stated that, on the day of a February winter theater production, Pan American's school secretary called her to inform her that the school would not pay for the sound, lighting, and photograph vendors used by Ms. James for the winter production, which Ms. James perceived to be an attempt to derail the production. Rule 56.1 Response ¶ 184. *See also* Exs. C at 54-56; G at 195-196; L at 96-97, 218-219.

116.    Ms. James offered to pay the vendors out of her pocket. However, when she told Mr. Iserman that she would pay for the technicians, he was dismissive to her concerns, which she also believed to be discriminatory. Rule 56.1 Response ¶ 186. *See also* Ex. C at 55-56 60-63.

117.    Ms. James acknowledged that the school ultimately paid the costs. Rule 56.1 Response ¶ 187. *See also* Exs. C at 155:11–24; MMM.

118.    The show was held on February 12, 2013, as scheduled at the Bard High School Auditorium. Rule 56.1 Response ¶ 188. *See also* Exs. C at 161; LLL.

119.    The day following the production, according to Ms. James, Principal Zanca did not acknowledge her, or congratulate the students on their performance. Rule 56.1 Response ¶ 189. *See also* Ex. C at 144.

120.    In the spring of 2013, Principal Zanca said that she would pay Ms. James for the per session hours associated with the February production, but that she would not pay teachers Crystal Gray (Caucasian) or Helio Sepulveda-Zornosa (Latino) for per session work. Rule 56.1 Response ¶ 191. *See also* Ex. C at 104-105.

121.    "Per session" is overtime paid to teachers who run or oversee different after-school or Saturday programs.    Per session is announced in postings prepared by the assistant principals. The postings note the set amount of hours available for the positions. Teachers have to submit applications for the positions and the approved applicant runs the program for the set amount of hours. Rule 56.1 Response ¶ 192. *See also* Ex. G at 175.

122.    In March 2013, Principal Zanca sent a memo to Ms. James as to how best facilitate an after-school theater program.    Ms. Zanca advised, in part, that postings would be required; that the activity would have serve students outside of Ms. James's class; and that the budget would have to be approved by administration.    Rule 56.1 Response ¶ 193. *See also* Ex. NNN.

123.    On April 3, 2013, Principal Zanca met with Assistant Principal Riccardo and Ms. James to discuss Pan American's after-school theater program.    Rule 56.1 Response ¶ 194. *See also* Exs. C at 82:13–15; PPP.

124.    According to Ms. James, Principal Zanca told her that the theater program would have to be eliminated due to budgetary constraints.    Rule 56.1 Response ¶ 195. *See also* Ex. C at 82-83.

125.    By letter dated April 8, 2013, Principal Zanca documented what occurred at the meeting. The letter stated that the theater program could continue, but that rehearsal time would be limited to four hours per week due to budgetary restraints.    Additionally, the letter stated that the program should be open to a large selection of students and that future performances would take place in the school's multi-purpose room instead of the Bard High School Auditorium.    Rule 56.1 Response ¶ 196. *See also* Exs. C at 140-141; OOO; PPP.

126. Ms. James stated that Assistant Principal Riccardo called her on Pan American's graduation, on or about June 22, 2013, to report allegedly racist comments that Principal Zanca had made about Ms. Hightower and Mr. Flanagan. According to Ms. James, Assistant Principal Riccardo told her that Principal Zanca had gone after the theater "'because you're black.'" Rule 56.1 Response ¶ 205. *See also* Ex. C at 91–92, 165:3–5.

127. Ms. James stated that at that point, that she "put all the dots together" and realized that she was discriminated against because of her race. She stated that she believed that Principal Zanca had created an "unbelievably hostile work environment with the entire staff, except [for] people she was close with" but that, with Ms. James, Ms. Hightower, and Mr. Flanagan, the attacks "were more targeted and relentless." Ms. James stated also that no one else at Pan American discriminated against her aside from Principal Zanca. Rule 56.1 Response ¶ 206. *See also* Ex. C. at 21-22; 92-93.

128. Ms. James stated that she never heard Principal Zanca make a racist comment. Rule 56.1 Response ¶ 207. *See also* Ex. C at 124, 151:21–23.

129. On June 26, 2013, an investigator from the DOE's Office of Special Investigations ("OSI") interviewed Ms. James to allegations included in an OSI complaint that Principal Zanca had lodged against Assistant Principal Riccardo. Rule 56.1 Response ¶ 209. *See also* Ex. UUU.

130. The OSI investigator, Jared Feirstein, interviewed Ms. James as to possible employee misconduct by Assistant Principal Riccardo. Rule 56.1 Response ¶ 210. *See also* Exs. C at 67; L at 235; O at 91-93, 95-96; James at 67; VVV.

131. Ms. James was questioned about not punching in for her per-session hours and the amount of per-session she had received. Rule 56.1 Response ¶ 211. *See also* Ex. C at 667-668.

132. Ms. James never filed a grievance with regard to Principal Zanca's alleged interference with the theater program. Rule 56.1 Response ¶ 212. *See also* Ex. C at 182, 203-205.

133. In September 2013, Ms. James transferred to the Manhattan Theater Lab High School ("Manhattan Theater") where she was employed as a theater teacher. Rule 56.1 Response ¶ 213. *See also* Ex. C at 121:17–24.

134. Ms. James worked at Manhattan Theater until June 2015, when the school closed. She then went to another school called Cascade where she worked for a month, and then went out on medical leave as a result of a breast cancer diagnosis. Rule 56.1 Response ¶ 215. *See also* Ex. C at 212:6–19.

135. After her departure from Pan American, Ms. James was replaced by Helio Sepulveda as Pan American's theater teacher for academic year 2013-14. Rule 56.1 Response ¶ 218. *See also* Ex. G at 203.

136. The per-session available for the after-school theatre program in 2013-14 was 150 hours per semester. Rule 56.1 Response ¶ 219. *See also* Ex. C at 204.

## VII. OTHER PAN AMERICAN TEACHERS

137. During the 2012-13 school year, Principal Zanca issued disciplinary letters to file and counseling memoranda to the following 15 pedagogical personnel (ethnicity in parentheses):

1. Sara Cunningham        (Caucasian);

2. Tomas McMillan        (Latino);



3.  Andrew Cameron        (Caucasian);

4.  Lissette Burgos       (Latina);

5.  Patricia Galoppo      (Latina);

6.  Christopher MacDevitt (Caucasian);

7.  Lourdes Gonzalez      (Latina);

8.  Kristin Donnelly      (Latina);

9.  Michael Cubbin        (Caucasian);

10. Lauren Maggiacomo     (Caucasian);

11. Juana Adames          (Latina);

12. John Flanagan         (African-American);

13. Azeen Keramati        (Middle-Eastern);

14. Anthony Riccardo      (Caucasian); and

15. Enio Angelo           (Caucasian).

Rule 56.1 Response ¶ 220. *See also* Ex. WWW.

138.   At the start of the 2012-13 school year, Pan American had 10 probationary teachers who would be eligible for tenure at the end of that school year:

1.  Samantha Bohdanowycz,

2.  Michael Capasso,

3.  Steve Espaillat,

4.  John Flanagan,

5.  Lourdes Gonzalez,

6.  Heather Hightower,

7.  Nicholas Klinovsky,

8. Vassiliki Konstantakakos,

9. Sonal Patel, and

10. Wendy Perez.

Rule 56.1 Response ¶ 221. *See also* Ex. LL at ¶ 5.

139. In September 2012, Sonal Patel resigned. Given when she resigned, Principal Zanca did not formally evaluate Ms. Patel and never made a decision regarding her eligibility for tenure. Rule 56.1 Response ¶ 222. *See also* Exs. G at 141, 145; LL at ¶ 6.

140. In February 2013, Samantha Bohdanowycz transferred from Pan American to Newcomers High School. As such, Principal Zanca did not issue her an annual performance rating and made no decision regarding her eligibility for tenure. However, prior to her transfer from Pan American, Ms. Bohdanowycz, a Caucasian English teacher, had received "satisfactory" ratings for formal classroom observations for lessons conducted on November 21, 2012 and December 17, 2012. Rule 56.1 Response ¶ 223. *See also* Exs. G at 141; LL at ¶ 7.

141. As of April 2013, Ms. Zanca had started logs of support and action plans for Chris MacDevitt, Patricia Galoppo and Lauren Maggiacomo. Rule 56.1 Response ¶ 224. *See also* Ex. XXX.

142. At the end of the 2012-13 academic year, probationary teachers, Mr. Capasso, Mr. Espaillat, Ms. Gonzalez, Mr. Klinovsky, and Ms. Perez received "satisfactory" annual ratings and one-year extensions of probation. Rule 56.1 Response ¶ 225. *See also* Exs. G at 34, 141-144; LL at ¶ 8.

143. Ms. Konstantakakos, a physical education teacher, obtained tenure. Rule 56.1 Response ¶ 226. *See also* LL at ¶ 8.

**VIII. Plaintiff Anthony Riccardo ("Assistant Principal Riccardo")**

144.   Assistant Principal Riccardo holds a bachelor's degree from Stony Brook University and a master's degree in science and teaching from Queens College.  He also has an advanced certificate in educational leadership and administration from the College of St. Rose, a New York State teaching license for biology, and a New York State School District Leader license. Rule 56.1 Response ¶ 227.  *See also* Exs. E at 11-12; YYY.

145.   In 2006, Mr. Riccardo began working for the DOE as a middle-school teacher at I.S. 93 as part of the New York City Teaching Fellows program. Rule 56.1 Response ¶ 228.  *See also* Exs. D at 5-6; E 16-17.

146.   In 2008, after two years at I.S. 93, Mr. Riccardo transferred to Pan American where he taught high-school biology. *See also* Exs. D at 6; E at 17:-18.  [Rule 56.1 Response ¶ 229.]

147.   At that time, Marcella Barros was the principal of Pan American.  Rule 56.1 Response ¶ 230.  *See also* Exs. D at 6; E 17:22–24.

148.   Some time prior to the start of the 2011 school year, Principal Barros promoted Mr. Riccardo to Assistant Principal of Organization at Pan American.   Rule 56.1 Response ¶ 231.  *See also* Exs. D at 607; E at 18:11–12, 21:10–1; ZZZ.

149.   As an assistant principal, Mr. Riccardo was subject to a five-year probationary period.  Rule 56.1 Response ¶ 232.  *See also* Exs. D at 18; Et 19:9–14.

150.   Under Principal Barros, Assistant Principal Riccardo's responsibilities included scheduling, programming, payroll, lunch duty, and attending teacher observations (if not writing teacher observation reports).  *See also* Ex. E at 21– 23, 48:13–24.  [Rule 56.1 Response ¶ 233.]

151. Principal Zanca replaced Principal Barros in August 2012, following the resignation of Principal Barros. Rule 56.1 Response ¶ 234. *See also* Ex. E at 46-47.

152. Under Principal Zanca, the administration conducted many more formal observations than it had under Principal Barros. Rule 56.1 Response ¶ 236. *See also* Ex. E at 33, 51.

153. When Principal Zanca became Pan American's principal, Juan Mendez was the superintendent. Assistant Principal Riccardo did not interact with Superintendent Mendez. Rule 56.1 Response ¶ 237. *See also* Ex. E at 34-35.

154. Assistant Principal Riccardo stated that Principal Zanca made racially discriminatory comments in his presence between September and December 2012. Rule 56.1 Response ¶ 238. *See also* Ex. E at 71–74.

155. According to Assistant Principal Riccardo, in September 2012, during the first few weeks of the school year, Principal Zanca referred to Azeen Keramati as "Taliban." Rule 56.1 Response ¶ 239. *See also* Ex. E at 85.

156. Assistant Principal Riccardo stated that also in September 2012, Principal Zanca announced her intent to get rid of John Flanagan. Rule 56.1 Response ¶ 240. *See also* Ex. E at 107, 131-132; 197-98.

157. Assistant Principal Riccardo stated that Principal Zanca made another discriminatory comment when she allegedly said to him, "did you see [Mr. Flanagan's] big lips quivering[?]" Rule 56.1 Response ¶ 241. *See also* Ex. E at 133-135.

158. Although he could not recall exactly when the comment was made, Assistant Principal Riccardo also stated that Principal Zanca said that Mr. Flanagan "look[ed] like the guy in the Tropicana commercial." Rule 56.1 Response ¶ 242. *See also* Ex. E at 136; 138.

159.     Assistant Principal Riccardo stated that he had never seen the Tropicana commercial, but he believed that the comment was racial in nature notwithstanding that he did not know the guy in the commercial to be African-American. Rule 56.1 Response ¶ 243. *See also* Ex. E at 137-138.

160.     Although he could not recall precisely when the comments were made, Assistant Principal Riccardo also stated that Principal Zanca commented on Ms. Hightower's hair and "how it was nappy and . . . how she can never have hair like that, and how [Ms. Hightower] looked like a gorilla in a sweater." Rule 56.1 Response ¶ 244. *See also* Ex. E at 138-139.

161.     Pursuant to Chancellor's Regulation A-830, DOE supervisors are required to report instances of discrimination to the OEO. Rule 56.1 Response ¶ 245. *See also* Exs. N at 70; AAAA.

162.     Specifically, Chancellor's Regulation A-830 provides as follows: "Supervisors are required to maintain an environment free of unlawful discrimination or discriminatory harassment . . . Supervisors are required to immediately report instances of any oral or written complaints of discrimination or discriminatory harassment committed by employees to OEO. . . . A supervisor's failure to report complaints or instances of discrimination to OEO may constitute a violation of this policy." Rule 56.1 Response ¶ 246. *See also* Ex. AAAA.

163.     A-830 also sets forth the types of discrimination prohibited at the DOE. Rule 56.1 Response ¶ 247. *See also* Exs. Q at 15-22; AAAA.

164.     Assistant Principal Riccardo admitted that he did not complain about these alleged discriminatory comments when Principal Zanca allegedly made them. He stated that he did not complain because he was afraid of losing his job, although he admitted that as of the time

Principal Zanca made her comments she had not disciplined him. Rule 56.1 Response ¶ 248. *See also* Ex. E at 71–72, 96, 139-140.

165.    Chancellor's Regulation A-830 provides for the submission of anonymous complaints. Rule 56.1 Response ¶ 249. *See also* Ex. AAAA.

166.    When asked why he did not submit an anonymous complaint, Assistant Principal Riccardo stated he had never considered doing so. Rule 56.1 Response ¶ 250. *See also* Ex. E at 95–96.

167.    Assistant Principal Riccardo acknowledged that anyone "who received a U rating got a log of assistance, including [him]." Rule 56.1 Response ¶ 253. *See also* Ex. E. at 155-156; BBBB.

168.    Around February 2013, Principal Zanca made Assistant Principal Riccardo the Assistant Principal of Security. By altering his role in this way, she took away his responsibilities over things like programming and payroll. Instead, he became responsible for student disciplinary and safety issues. Rule 56.1 Response ¶ 254. *See also* Ex. E at 53-54, 57, 59–60.

169.    Assistant Principal Riccardo began looking for other employment in April 2013. Rule 56.1 Response ¶ 256. *See also* Ex. E at 166, 168.

170.    On April 30, 2013, Principal Zanca held a disciplinary conference with Assistant Principal Riccardo and his union representative to discuss errors he had committed in class programming and on the student transcripts. Rule 56.1 Response ¶ 257. *See also* Ex. CCCC.

171.    On May 2, 2013, Principal Zanca issued two letters to file to Assistant Principal Riccardo—one concerning the programming errors and one concerning transcript problems. Rule 56.1 Response ¶ 258. *See also* Ex. CCCC.

172. According to the May 2 letter regarding class programming, a "large number of students had holes in their programs, class sizes ranged from 4 to 70 students, and several teachers only had three classes to teach." Rule 56.1 Response ¶ 259. *See also* Ex. CCCC at USA 002490.

173. According to the May 2 letter regarding transcript errors, a review of seniors' transcripts revealed an abundance of errors—some of which resulted in five students' graduation status being revoked. The letter noted that, as the direct supervisor of guidance counselors, Assistant Principal Riccardo had been responsible for supervising their work and that he had failed to do so. Rule 56.1 Response ¶ 261. *See also* Exs. G at 226-228, 250-252, 260-261; L at 43-46; CCCC at USA 002491.

174. As these were letters to file, they were disciplinary in nature. Assistant Principal Riccardo made no attempt to rebut the letters. Rule 56.1 Response ¶ 263. *See also* Exs. E at 83-84; L at 116-117.

175. Principal Zanca shared concerns regarding what she believed was an excessive amount of per-session being paid to Ms. James for her after-school theater rehearsals for the winter theater production – which is a one day production that had been held on February 12, 2013. Rule 56.1 Response ¶ 265. *See also* Ex. G at 35; LLL.

176. Principal Zanca also had concerns that a number of Pan American teachers were being paid per-session without appropriately reflecting the time on their timesheets. Rule 56.1 Response ¶ 266. *See also* Exs. G at 182-183; R at 77-80.

177. In February 2013, Principal Zanca and CFN 106 Deputy Network Leader Randall Iserman began to review the per-session timesheets to ensure that they were documented and approved properly, and were not for excessive amounts. During the course of their review,

they discovered that Assistant Principal Riccardo had been approving his own per session timesheets for a period of time. Rule 56.1 Response ¶ 267. *See also* Exs. G at 212; L at 43-44, 50-54, 56-59; O at 46-47; V; UUU.

178. As Deputy Network Leader, Mr. Iserman was responsible for providing operational support such as financial management, human resources, facilities, data management and compliance to the schools following under CFN 106. Rule 56.1 Response ¶ 268. *See also* Ex. L at 16-17.

179. On June 19, 2013, an OSI investigator notified Assistant Principal Riccardo that he was subject to an investigation and interviewed him regarding the allegations on June 28, 2013. Rule 56.1 Response ¶ 271. *See also* Exs. UUU, DDDD.

180. In October 2013, OSI ultimately substantiated the allegation that Assistant Principal Riccardo had committed misconduct by approving his own per-session work and concluded that Assistant Principal Riccardo exercised poor judgment by not posting per-session work performed by Ms. James as postings were required by DOE policy. The remaining allegations were not substantiated, which means that OSI could not determine if any misconduct occurred. Rule 56.1 Response ¶ 272. *See also* Ex. N at 52; O at 30-32, 39-41; 56-60; 84-85, 239; UUU.

181. Assistant Principal Riccardo stated that he was absent for medical reasons during the entire month of May 2013. Rule 56.1 Response ¶ 273. *See also* Exs. E at 177; EEEE.

182. Although a DOE medical inspector determined that Assistant Principal Riccardo's absences were medically justified, Principal Zanca issued a letter to file for excessive absenteeism on the ground that he had been out for more than 34 days between December 2012 and June 2013. Rule 56.1 Response ¶ 274. *See also* Ex. EEEE, GGGG at USA002487-2489.

183. On June 18, 2013, Principal Zanca held a disciplinary conference for an incident that occurred on June 6, 2013. Rule 56.1 Response ¶ 276. *See also* Ex. GGGG at 002484-2485.

184. According to the letter to file issued to Assistant Principal Riccardo for the incident, Principal Zanca had asked Assistant Principal Riccardo why he had rated a lesson satisfactory when he had previously remarked to her that the lesson was poor. The letter stated that Assistant Principal Riccardo raised his voice and said, "'Do you want it to be unsatisfactory?'" Rule 56.1 Response ¶ 277. *See also* Ex. GGGG at 002484-2485.

185. At that point, according to the letter, Assistant Principal Riccardo began typing on his phone. When Principal Zanca told him to stop texting and to get back to work, Assistant Principal Riccardo yelled, according to the letter, "'go to your office and leave me alone.'" Rule 56.1 Response ¶ 278. *See also* Ex. GGGG at 002484-2485.

186. The letter states that Principal Zanca said that she felt threatened and was going to call security. When security arrived, according to the letter, Assistant Principal Riccardo proceeded to leave school premises without authorization. Rule 56.1 Response ¶ 279. *See also* Ex. GGGG at 002484-2485.

187. As recounted in the letter, at the June 18 disciplinary meeting, Principal Zanca told Assistant Principal Riccardo that his conduct was unprofessional and amounted to insubordination to which Assistant Principal Riccardo responded, "'it's by example set by you.'" The letter concluded by stating that the incident could lead to further disciplinary action, including an unsatisfactory rating and discontinuance of her probationary service. Rule 56.1 Response ¶ 280. *See also* Ex. GGGG at 002484-2485.

188.  In a June 2013 letter, Principal Zanca indicated that she did not believe that Assistant Principal Riccardo had achieved his professional goals for the 2012–2013 school year—including his goal of deepening his understanding of Common Core Learning Standards, implementing viable safety and security procedures that have a positive impact on Pan American's community, and deepening his understanding of the observation process and upcoming revisions to that process.  Rule 56.1 Response ¶ 282.  *See also* Ex. FFFF.

189.  On June 17, 2013, Principal Zanca printed Assistant Principal Riccardo's annual performance review, which rated him unsatisfactory for his performance during the 2012–13 academic year and recommended the discontinuance of his probationary employment. Principal Zanca signed the evaluation on June 25, 2013, and Superintendent Mendez signed the evaluation on June 26, 2013.  Rule 56.1 Response ¶ 283.  *See also* Ex. HHHH.

190.  In support of the unsatisfactory rating and recommendation for discontinuance, Principal Zanca relied on the May 2013 letter regarding Assistant Principal Riccardo's dereliction in duty with respect to the programming errors; the excessive errors on students' transcripts which led the revocation of graduation for some students; the June 18, 2013 letter regarding Assistant Principal Riccardo's insubordination; and the June 18, 2013 letter to file documenting Assistant Principal Riccardo's excessive absenteeism.  Rule 56.1 Response ¶ 284. *See also* Ex. HHHH at section 4.

191.  On June 24, 2013, Assistant Principal Riccardo produced a statement that purported to recount events that occurred at Pan American during the 2012–2013 school year.  It was during June 2013 that Assistant Principal Riccardo first told Mr. Flanagan, Ms. James, and Ms. Hightower of the alleged discriminatory comments made by Principal Zanca.  Rule 56.1 Response ¶ 286.  *See also* Exs. C at 91-94; HHHH.

192. The statement recounted the alleged discriminatory comments made by Principal Zanca during the first half of the 2012–2013 year discussed above. Rule 56.1 Response ¶ 287. *See also* Ex. HHHH.

193. The statement noted that Principal Zanca would determine the rating of a teacher before the lesson observation even began. Rule 56.1 Response ¶ 288. *See also* Ex. HHHH.

194. The statement indicated that while other teachers received unsatisfactory ratings, Mr. Flanagan and Ms. Hightower were especially targeted. Rule 56.1 Response ¶ 289. *See also* Ex. HHHH.

195. According to the statement, Principal Zanca predetermined the ratings for all of Mr. Flanagan's lessons and directed Assistant Principal Riccardo not to make Ms. Hightower a better teacher. Rule 56.1 Response ¶ 290. *See also* Ex. HHHH.

196. The statement noted that Principal Zanca's decision to discontinue Mr. Flanagan and Ms. Hightower was possibly driven by race. Rule 56.1 Response ¶ 291. *See also* Ex. HHHH.

197. According to the statement, Principal Zanca decided in February 2013 to "essentially shut down the theater program on [Ms.] James." Assistant Principal Riccardo wrote that even "though money was earmarked for the program, Principal Zanca pulled the funds and used [them] on Smartboards." Rule 56.1 Response ¶ 292. *See also* Ex. HHHH.

198. Assistant Principal Riccardo stated that his ultimate goal was to send it to Superintendent Mendez, but he stated that he is not sure if he sent it to him. Rule 56.1 Response ¶ 294. *See also* Ex. E at 35-36, 196-197.

199. Assistant Principal Riccardo stated that during 2012-13 school year, no teachers complained to him about discrimination. Rule 56.1 Response ¶ 296. *See also* Ex. D at 64-65.

200. Principal Zanca initially learned of the allegations of discrimination asserted by Assistant Principal Riccardo in his statement from the news in the summer of 2013. Rule 56.1 Response ¶ 297. *See also* Ex. G at 24.

201. The first news release regarding the allegation of discrimination appeared on June 27, 2013. As part of the media coverage, Assistant Principal Riccardo was interviewed on television and on a radio program on or about June 29, 2013 and July 1, 2013. Rule 56.1 Response ¶ 298. *See also* Exs. D at 47; JJJJ.

202. Principal Zanca denies the allegations of discrimination delineated in Assistant Principal Riccardo's June 24, 2013 statement. Rule 56.1 Response ¶ 299. *See also* Ex. G at 26-27, 33, 35 48, 118-119.

203. By letter dated June 27, 2013, Superintendent Mendez notified Assistant Principal Riccardo that he would consider whether to discontinue his probationary service and invited him to submit a written response before that determination was made. Rule 56.1 Response ¶ 300. *See also* Ex. KKKK.

204. Assistant Principal Riccardo stated that he contacted Bob Reich from his union, the Council of Supervisors and Administrators, around this time to discuss how to respond to his unsatisfactory rating. According to Assistant Principal Riccardo, he had learned that Reich was the person to contact in this situation from something that he had read in a union newsletter. Rule 56.1 Response ¶ 301. *See also* Ex. E. at 185, 208.

205. Around this time, in June 2013, Assistant Principal Riccardo's union representative Mercedes Qualls discussed the possibility of signing a stipulation to resign. Assistant Principal Riccardo received a stipulation drafted by Reich that contained largely the same terms as the stipulation that he would later sign, but he did not sign this earlier version. Rule 56.1 Response ¶ 302. *See also* Ex. E at 185-187.

206. On July 26, 2013, Assistant Principal Riccardo sent a letter to Superintendent Juan Mendez contesting his termination. The letter stating that the evidence provided to him by Principal Zanca was "embellished and inaccurate in order to retaliate again" him. He accused Principal Zanca of being "an unethical tyrant in her short time a[t] the school." The letter stated that Assistant Principal Riccardo had attempted to contact Superintendent Mendez several times by email and phone but that he had not received a reasons. Finally, the letter stated that if Assistant Principal Riccardo did not hear from Superintendent Mendez that would "consider all of [his] legal options." Rule 56.1 Response ¶ 303. *See also* Ex. LLLL.

207. In August 2013, at Assistant Principal Riccardo's request, Superintendent Mendez met with Assistant Principal Riccardo. Rule 56.1 Response ¶ 304. *See also* Exs. E at 188; I at 266-273; MMMM.

208. In an email dated Aug. 16, 2013, Assistant Principal Riccardo laid out the terms of the stipulation. He later stated that he had no questions with respect to the terms of the release. Rule 56.1 Response ¶ 307. *See also* Ex. E at 203–204; MMMM.

209. Superintendent Mendez played no role in drafting the Stipulation of Settlement. Rule 56.1 Response ¶ 309. *See* Ex. I at 277, 286-291.

210. Assistant Principal Riccardo signed the final version of the stipulation on August 28, 2013. Superintendent Mendez signed it on October 7, 2013. Principal Zanca signed it

on October 18, 2013. Bob Reich signed it on October 30, 2013. Rule 56.1 Response ¶ 310. *See* Exs. E at 206:25–207:2; NNNN.

211. Assistant Principal Riccardo stated that he reviewed the stipulation and did not have any questions about its terms. Rule 56.1 Response ¶ 311. *See also* Ex. E at 187, 204.

212. The stipulation stated that Assistant Principal Riccardo agreed to irrevocably resign from the DOE effective August 25, 2013. Rule 56.1 Response ¶ 312. *See also* Ex. NNNN at ¶ 1.

213. The stipulation also indicated that Principal Zanca would issue Assistant Principal Riccardo a satisfactory rating for his performance during the 2012–2013 school year. Rule 56.1 Response ¶ 313. *See also* Ex. NNNN at ¶ 1.

214. The stipulation further provided that Assistant Principal Riccardo "waives all claims against the Chancellor, the Principal, the Department of Education or any of its agents or employees in any administrative, judicial, or other form arising out of the unique and particular facts of this matter." Rule 56.1 Response ¶ 314. *See also* Ex. I at 286-291; NNNN at ¶ 6.

215. Finally, the stipulation expressly stated that Assistant Principal Riccardo "acknowledges that he understands and accepts the terms of th[e] Stipulation. That he has been fully and fairly represented by the Union and/or had the opportunity to seek legal counsel throughout this process, and that []he enters into this Stipulation of his own free will." Rule 56.1 Response ¶ 315. *See also* Ex. NNNN at ¶ 7.

216. Assistant Principal Riccardo stated that he was motivated to sign the stipulation because he "wanted to get an S rating, that's really what [he] was concerned about and [he] figured this was pretty much the only thing – the only recourse [he] had at the time." Rule 56.1 Response ¶ 316. *See also* Ex. E at 205:16-18.

217.   Following Assistant Principal Riccardo's execution of the stipulation, he submitted a letter of resignation to the DOE.  Rule 56.1 Response ¶ 317.  *See also* Ex. D at 50; OOOO.

218.   Assistant Principal Riccardo stated that he knew he was not discontinued because after "meeting with the superintendent, [the discontinuance and unsatisfactory rating] was overturned, so I don't know if it ever went in the system as a discontinuance.  I think it just shows up it's a satisfactory with a resignation."  Rule 56.1 Response ¶ 318.  *See also* Exs. D at 49:18-24; E at 180.

## IX.   SCI Investigation

219.   On July 30, 2013, following a report to Principal Zanca that Assistant Principal Riccardo offered to obtain marijuana for another employee, the Special Commissioner of Investigation ("SCI") opened an investigation into the matter.  Rule 56.1 Response ¶ 319-320. *See also* Ex. PPPP at SDNY 991.

220.   In the course of the investigation, the SCI investigator initially contacted Assistant Principal Riccardo on October 22, 2013 and interviewed him on November 7, 2013. Rule 56.1 Response ¶ 321.  *See also* Ex. PPPP at SDNY 991.

221.   The case was ultimately unsubstantiated.  Rule 56.1 Response ¶ 322.  *See also* Exs. PPPP, QQQQ.

## X.   OEO & EEOC Activity

222.   Formal investigations of discrimination are conducted by the DOE's Office of Equal Opportunity ("OEO") and Office of Special Investigations ("OSI").  Rule 56.1 Response ¶ 327.  *See also* Ex. I at 223-24, 227-29.

223. Mr. Flanagan filed a race discrimination complaint with the OEO on June 3, 2013. He filed before Assistant Principal Riccardo shared his June 24, 2013 statement. There is no mention in Mr. Flanagan's OEO complaint of any alleged discriminatory comments made by Principal Zanca. Rule 56.1 Response ¶ 328. *See also* Ex. OO.

224. Ms. Hightower filed her complaint of race and ethnicity discrimination with the OEO on June 24, 2013. Rule 56.1 Response ¶ 329. *See also* Ex. RRRR.

225. Ms. James also filed her complaint of race and ethnicity discrimination with the OEO on June 24, 2013. Rule 56.1 Response ¶ 330. *See also* Ex. SSSS.

226. On July 9, 2013, upon learning that Mr. Flanagan, Ms. Hightower, and Ms. James were considering filing external complaints, they were advised, in the presence of their union representation, that an external filing would result in the administrative closure of their OEO reports. Rule 56.1 Response ¶ 331. *See also* Ex. TTTT.

227. On July 23, 2013, on the basis of an interview with Assistant Principal Riccardo, the OEO initiated a complaint on his behalf regarding his allegations of discrimination regarding other employees. Rule 56.1 Response ¶ 333. *See also* Ex. UUUU.

228. On August 13, 2013, the OEO administratively closed its investigation into the discrimination complaints filed by Mr. Flanagan, Ms. Hightower, and Ms. James. Rule 56.1 Response ¶ 334. *See also* Ex. Q at12-15, 97-99; VVVV.

229. The OEO eventually administratively closed its investigations into Anthony Riccardo's complaint of discrimination. Rule 56.1 Response ¶ 335. *See also* Ex. Q at 12-15, 87.

230. Administrative closures occur when the case is closed before an investigation is finished and there are no findings or conclusions made. Rule 56.1 Response ¶ 336. *See also* Ex. Q at 12-13.

231. Ms. Hightower filed a charge of race discrimination with the EEOC. Rule 56.1 Response ¶ 338. *See also* Ex. WWWW.

232. Assistant Principal Riccardo filed a charge of race discrimination with the EEOC. Rule 56.1 Response ¶ 339. *See also* Ex. WWWW.

233. Ms. James filed a charge of race discrimination with the EEOC. Rule 56.1 Response ¶ 340. *See also* Ex. WWWW.

234. Mr. Flanagan filed a charge of race discrimination with the EEOC. Rule 56.1 Response ¶ 341. *See also* Ex. WWWW.

SO ORDERED.

Dated:     January 8, 2020

_____
Lewis A. Kaplan
United States District Judge